891 P.2d 1041

**AIG HAWAI'I INSURANCE COMPANY, INC., Plaintiff–Appellant,**

v.

**Pat VICENTE, Defendant–Third– Party Plaintiff–Appellee,**

and

**Billy Bateman, Defendant,**

v.

**Flor CORPUZ and Aida Corpuz, Third–Party Defendants.**

No. 16114.

Supreme Court of Hawai'i.

March 30, 1995.

Carleton B. Reid and Carolyn A. Wilson of Reid, Richards & Miyagi, on the briefs, Honolulu, for plaintiff-appellant.

Kevin S.W. Chee and Keith T. Kato of Chee & Markham, on the briefs, Honolulu, for defendant-third-party plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

In this action for declaratory relief, plaintiff-appellant AIG Hawai'i Insurance Co., Inc. (AIG) sought a judicial determination of its duty to defend and indemnify defendant Billy Bateman under an automobile liability insurance policy issued by AIG to third-party defendant Flor Corpuz for the claims asserted against Bateman by defendant/third-party plaintiff-appellee Pat Vicente. The dispute arose out of an automobile accident that occurred on November 1, 1989 involving vehicles operated by Bateman and Vicente.

AIG appeals from an order granting Vicente's motion for summary judgment, entered on June 14, 1991, and an order granting in part and denying in part Vicente's motion for summary judgment, filed on April 14, 1992. On appeal, AIG argues that the trial court erred in concluding that Bateman was a permissive user of the insured vehicle and was therefore a "covered person" under the AIG policy issued to Corpuz.

For the reasons discussed below, we hold that Bateman was not a permissive user of the insured vehicle and was therefore not a "covered person" under the insurance contract. Consequently, AIG does not owe a duty to defend or indemnify Bateman for the claims asserted against him by Vicente. We therefore vacate the circuit court's order granting summary judgment in favor of Vicente and remand the case with instructions to enter summary judgment in favor of AIG and against Vicente.

## I. BACKGROUND

The underlying facts are not in dispute. On November 1, 1989, Corpuz was the registered owner of a 1990 Mazda 323 sedan insured by AIG, as well as the named insured on the AIG policy, which provided, *inter alia*, bodily injury liability coverage. Although Corpuz made the down payment for the insured vehicle and paid all of the automobile loan payments until the date of the accident, the principal user of the insured vehicle was Corpuz's seventeen-year-old daughter, third-party defendant Aida Corpuz (Aida).

Corpuz had explicitly instructed Aida not to allow anyone else to drive the insured vehicle. However, Aida had allowed Bateman, her boyfriend, to drive the vehicle on several occasions without Corpuz's knowledge. In his deposition testimony, Corpuz stated that he did not know Bateman even existed, let alone that Bateman was dating Aida or driving the insured vehicle.

On November 1, 1989, Bateman was driving Aida home from work in the insured vehicle when they were involved in a collision with a vehicle driven by Vicente. On December 21, 1989, AIG brought this action for declaratory relief, seeking a judicial determination that it had no duty to defend and/or indemnify Bateman against the bodily injury claims made by Vicente. AIG maintained that Bateman was not a "covered person" under the policy because Bateman was not using the insured vehicle with Corpuz's permission.

On April 2, 1991, AIG filed a motion for summary judgment. Vicente also filed a motion for summary judgment on May 23, 1991. By order filed on May 9, 1991, the circuit court denied AIG's motion and, by order filed on June 14, 1991, granted Vicente's motion. AIG filed a notice of appeal on July 12, 1991. This court dismissed the appeal on December 3, 1991 because the judgment was not final as to all claims and parties insofar as the cross-claim brought by Vicente against Bateman was still pending.

On February 18, 1992, Vicente filed a second motion for summary judgment; the motion was granted in part and denied in part

by order filed on April 14, 1992. On April 28, 1992, Vicente dismissed her crossclaim against Bateman without prejudice, and this appeal followed.

## II. *STANDARD OF REVIEW*

It is well settled that

[o]n appeal, an award of summary judgment is reviewed under the same standard applied by the trial courts. Under Hawai'i Rules of Civil Procedure Rule 56(c), summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 121, 883 P.2d 38, 42, *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994) (quoting *Sol v. AIG Hawai'i Ins. Co.,* 76 Hawai'i 304, 306, 875 P.2d 921, 923, *reconsideration denied,* 76 Hawai'i 353, 877 P.2d 890 (1994)) (internal citations omitted); *see also Sentinel Ins. Co. v. First Ins. Co. of Hawai'i,* 76 Hawai'i 277, 287, 875 P.2d 894, 904, *reconsideration granted,* 76 Hawai'i 453, 879 P.2d 558 (1994).

## III. *DISCUSSION*

The dispositive issue before us is whether Bateman qualifies as a "covered person" under the AIG policy issued to Corpuz. Pursuant to the "omnibus" clause of the policy, the definition of "covered person" includes "any person using [the named insured's] covered auto with [the named insured's] permission." The policy does not otherwise define "permission."

We have often noted that "insurance policies are governed by statutory requirements in force and effect at the time such policies are written.... Such provisions are read into each policy issued thereunder, and become a part of the contract with full binding effect upon each party." *AIG Hawai'i Ins. Co. v. Caraang,* 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (quoting *National Union Fire Ins. Co. v. Ferreira,* 71 Haw. 341, 344, 790 P.2d 910, 912 (1990)) (internal quotation marks omitted). Hawai'i Revised Statutes (HRS) § 431:10C–301(a)(2) (1987 Spec.Pamphlet) provides in pertinent part:

**Required motor vehicle policy coverage.** (a) In order to meet the requirements of a no-fault policy as provided in this article, an insurance policy covering a motor vehicle shall provide:

. . . .

(2) Insurance to pay on behalf of the owner *or any operator of the insured motor vehicle using the motor vehicle with the express or implied permission of the named insured,* sums which the owner or operator may legally be obligated to pay for injury, death, or damage to property of others ... which arise out of the ownership, operation, maintenance, or use of the motor vehicle[.]

(Emphasis added.) Similarly, HRS § 287–25(2) (1985) provides in pertinent part:

**Owner's policy requirements.** An owner's policy of liability insurance:

. . . .

(2) Shall insure the person named therein and any other person, as insured, using any such motor vehicle ... *with the express or implied permission of the named insured,* against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of the motor vehicle[.]

(Emphasis added.)

Pursuant to the language of the above statutes, as read into the policy in issue, Bateman is a "covered person," if he was using the insured vehicle with either the express or implied permission of Corpuz. *See also* 12 G. Couch, *Cyclopedia of Insurance Law* § 45:350 at 692 (2d ed.1981) [hereinafter, Couch] ("The permission required to bring an additional insured within the protection of an omnibus clause may, as a general proposition, be express or implied, and the omnibus clause may specifically provide, or be required by statute to provide, that the permission of the named insured may be express or implied.").

There is no dispute that Corpuz did not give Bateman express permission to use the insured vehicle. Indeed, Corpuz did not even know of Bateman's existence prior to the accident. The question is therefore nar-

rowed to whether Bateman was operating the insured vehicle with Corpuz's implied permission.

### A. Basic Principles of Implied Permission

Couch notes that "[i]mplied permission may arise as a product of the present or past conduct of the insured, and the relationship between the parties, including the lack of any objection to the use by the permittee, which signifies acquiescence or consent of the insured[.]" Couch, supra, § 45:352 at 696–97. Implied permission "is usually shown by such usage and practice of the parties over a sufficient period of time prior to the day on which the insured car was being used, as would indicate to a reasonable mind that the permittee had the right to assume permission under the particular circumstances." Id. at 697–99.

Decisions from other jurisdictions have also held that implied permission may be proven from circumstantial evidence. For example, in Subscribers at the Automobile Club Inter–Insurance Exchange v. McClanahan, 607 S.W.2d 718 (Mo.App.1980), the Missouri Court of Appeals noted that "[p]ermission may be proven by circumstantial evidence, but the circumstances must be such that the necessary fact may be inferred therefrom and must reasonably follow, so that the conclusion so reached is not the result of guesswork, conjecture or speculation." Id. at 721 (quoting United States Fidelity and Guar. Co. v. Safeco Ins. Co. of America, 522 S.W.2d 809, 816 (Mo.1975)).

### B. The Scope of the Permission

It is undisputed that Aida expressly allowed Bateman to drive the insured vehicle. It is also undisputed that: (1) Corpuz did not know Bateman was driving the insured vehicle; (2) there is no evidence of any relationship between Corpuz and Bateman; and (3) there is no evidence of any conduct on the part of Corpuz indicating consent or acquiescence to anyone's use of the insured vehicle other than Aida.

In the absence of any affirmative evidence indicating Corpuz impliedly permitted Bateman to drive the insured vehicle, we examine whether, as a matter of law, the scope of permission conferred upon Aida by Corpuz included the ability to permit others to drive the insured vehicle; or in other words, whether Corpuz impliedly permitted Bateman to drive the vehicle through the scope of permission Corpuz conferred upon Aida. The outcome-dispositive issue, therefore, rests on the effect of Corpuz's express limitation of Aida's ability to allow others to drive the insured vehicle.

In Columbia Casualty Co. v. Hoohuli, 50 Haw. 212, 437 P.2d 99 (1968), this court had occasion to analyze a similar situation involving an omnibus clause and the scope of permission between a named insured, a first permittee, and a second permittee. In Hoohuli, Wallace Yamamoto owned a dump truck insured by appellant United States Fidelity & Guaranty Company (USF & G). Yamamoto leased the truck to Mid–Pacific Trucking, Inc. (Mid–Pac). The policy insuring the truck contained an omnibus clause that extended coverage to "any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the Named Insured or such spouse or with the permission of either." Id. at 212–13, 437 P.2d at 101.

On the date of the accident, appellee Hoohuli, an employee of Mid–Pac, was instructed to drive the truck from a Mid–Pac work site back to the Mid–Pac truck yard. On the way back to the yard, he saw some of his friends who were going to the beach. Hoohuli parked the truck on a side street, joined his friends in their car, and went to the beach. They remained at the beach until after sundown, when Hoohuli's friends drove Hoohuli back to the truck at approximately 8:00 p.m. Hoohuli then started to return the truck to the Mid–Pac yard; but after driving two or three blocks, he noticed that the braking system was losing air pressure and stopped to call a repairman. After Hoohuli got out of the truck, the truck began rolling down a hill. He jumped back into the truck and attempted to get the truck under control. However, the brakes failed, and Hoohuli could not prevent the truck from rolling onto the sidewalk and into a house. Several people, who were in the house, were injured and brought suit against Hoohuli and Mid–Pac.

Noting that USF & G could be held liable only if Hoohuli was driving the truck at the

time of the accident with Yamamoto's express or implied permission, the *Hoohuli* court set out three rules as developed by the case law addressing the issue at the time, namely: (1) the "strict" or "conversion" rule, which required that the scope of permission include the precise use to which the permittee is putting the automobile at the time of the accident for the permittee to be operating with the named insured's permission; (2) the "liberal" or "initial permission" rule, where if a permittee is given permission to use the car, regardless of express or implied restrictions on his or her operation, the permittee is covered for any subsequent use short of theft or the like; and (3) the "moderate" or "minor deviation" rule, where a permittee is covered, if the use at the time of the accident is no more than a slight deviation from the scope of permission actually given. *Id.* at 216, 437 P.2d at 103.

In its analysis of the rules available, the *Hoohuli* court sought to adopt or craft a rule consistent with Hawai'i's statutory scheme and was mindful of the principle that interpretation of a statutorily mandated omnibus clause requires a balancing of competing interests. The *Hoohuli* court noted:

> By extending coverage, the omnibus clause protects the named insured, the permittee who may be uninsured otherwise, and the innocent party injured by an otherwise uninsured permittee. Clearly these interests would support the broadest possible construction, the initial permission rule or even complete coverage for anyone driving the car. On the other hand, the legislatively required omnibus clause infringes on the insurer's right to select its risks. The clause shifts to the named insured the right to select additional insureds which the insurer might have declined to cover. Moreover, in selecting the additional insured, the named insured may be unconcerned with the additional insured's "insurability." These reasons would support a relatively narrow construction.

*Id.* at 217–18, 437 P.2d at 104.

Seeking a rule that would permit a high degree of predictability, the *Hoohuli* court first rejected both the "strict" and "initial permission" rules, noting that "[t]he alleged high degree of certainty which accompanies the strict and initial permission rules turns out to be illusory because of the exceptions which seem to evolve." *Id.* at 218, 437 P.2d at 105. Instead, seeking to strike a balance between "expansive interpretation" of the omnibus clause "within a limit of reasonableness," *id.* at 218–19, 437 P.2d at 105, the *Hoohuli* court ultimately rejected all three rules, adopting instead the test announced by the Supreme Court of Vermont, providing that:

> with a showing that the vehicle was placed in the hands of the operator by consent, a presumption arises that the particular use to which the vehicle was being put was within the scope of that consent as measured by the law. The overcoming of this presumption requires evidence establishing that consent had been expressly withdrawn prior to the actual use, or that the actual use was so far afield from the purpose of the loan of the vehicle as to amount to, at best, a temporary tortious conversion.

*Id.* at 219, 437 P.2d at 105 (quoting *American Fidelity Co. v. North Brit. & Merc. Ins. Co.*, 124 Vt. 271, 275, 204 A.2d 110, 113 (1964)).

The *Hoohuli* court therefore held that, under this approach, Hoohuli was driving the truck with the named insured's implied permission, specifically noting that the named insured did not place any limitation on the use of the truck when leasing the truck to Mid–Pac. The court noted that, because the case arose out of a commercial context and the named insured conceivably could not have expected the corporation to drive the truck when he leased it to Mid–Pac, the named insured surely must have contemplated that a Mid–Pac employee would drive the truck. It was to the employee that the named insured gave permission. *Hoohuli*, 50 Haw. at 219, 437 P.2d at 105. The court therefore treated Hoohuli as a "first" permittee. *Id.*[1]

**1.** The Vermont case relied upon by the *Hoohuli* court, *American Fidelity Co. v. North British &*

*Mercantile Insurance Co., Ltd.*, 124 Vt. 271, 204 A.2d 110 (1964), was also a "first permittee"

■ Most importantly, however, for purposes of the present case, the *Hoohuli* court held that, although Hoohuli could have been considered to be a "first" permittee, the result would be the same if Hoohuli was considered a "second" permittee, because

> Yamamoto [the named insured] gave Mid–Pac [the first permittee] *complete dominion* over the truck.... Normally *a second permittee is limited not only by the scope of permission from the named insured to the first permittee,* but also may be limited by a narrower scope of permission from the first permittee to him. In this case, Mid–Pac chose to narrow the scope of permission it received from Yamamoto by prohibiting Hoohuli from using the truck for pleasure.

*Id.* at 220, 437 P.2d at 105 (emphasis added). Three principles are immediately apparent from the above-quoted language: (1) the Vermont rule establishing a presumption in favor of coverage for a first permittee, as adopted in *Hoohuli,* applies to a second permittee where the named insured places "complete dominion" over the insured vehicle in the hands of the first permittee; (2) the second permittee is limited by the scope of permission from the named insured to the first permittee; and (3) limitations expressed verbally between the named insured and the first permittee and between permittees will be respected and given effect provided such verbal limitations are supported by sufficient evidence.

■ We believe these principles adopted and enunciated in *Hoohuli* control the dispo-

sition of the present case. We adhere to the position announced in *Hoohuli* that where a named insured places "complete dominion" over the insured vehicle in the hands of a first permittee and does not otherwise limit the scope of permission granted, a rebuttable presumption arises that the scope of the permission granted to the first permittee includes the ability to allow others to drive the insured vehicle. As we noted in *Hoohuli,* "[t]he party who would limit the scope of permission must discharge a heavy burden and therefore in most cases coverage will be clear." 50 Haw. at 219, 437 P.2d at 105.

■ Applying the *Hoohuli* principles to the present case, it is undisputed that, when Corpuz granted Aida permission to drive the insured vehicle, he explicitly instructed her not to allow others to drive the vehicle. Corpuz, therefore, did not place "complete dominion" over the insured vehicle in Aida. The scope of Corpuz's permission to Aida, the first permittee, was *limited,* and inasmuch as a "second permittee is limited ... by the scope of permission from the named insured to the first permittee," *id.* at 220, 437 P.2d at 105, the scope of permission allegedly accorded Bateman, the purported second permittee, by Aida, the first permittee, was correspondingly limited; thus, Bateman *could not* have driven the insured vehicle with the implied permission of Corpuz. In other words, on the record before us, Bateman cannot possibly be a permissive user and cannot possibly be a "covered person"

---

case. In *American Fidelity,* Mr. Blanchard, test driving a car owned by Mr. Fredette, a car dealer, struck and injured plaintiffs in the underlying tort suit, who were sitting in their parked car. At the time of the accident, Blanchard was using the car to take two six-year-old children to get ice cream. Blanchard became liable to pay a $6,000 judgment in favor of the injured parties, and Blanchard's insurer brought a declaratory judgment action against Fredette's insurer for contribution. Analyzing the three prevailing rules gleaned from existing precedent in other jurisdictions, the *American Fidelity* court rejected them all, much as we did in *Hoohuli,* and formulated its own rule.

The *American Fidelity* court held that, with a showing that the vehicle was placed in the hands of the operator by consent, a presumption arises that the particular use to which the vehicle was

being put was within the scope of that consent as measured by the law. Because the record revealed that both Blanchard and Fredette agreed that there had been no conversation between them relative to any restrictions on the use by Blanchard of any Fredette vehicle turned over to him, the court concluded that there was insufficient evidence to overcome the presumption that Blanchard's use was within the scope of Fredette's consent. The court thereby rejected the trial court's conclusion that testimony by both Blanchard and Fredette, indicating an intention on the part of Fredette and a realization on the part of Blanchard that the car was in Blanchard's possession for the purposes of demonstration and sale, was sufficient to allow the court to conclude that the vehicle was in Blanchard's possession without permission.

entitled to coverage under the AIG policy issued to Corpuz.

The dissent relies heavily upon the decision in *Gillen v. Globe Indemnity Co.*, 377 F.2d 328, 333 (8th Cir.1967), and by doing so, ostensibly advocates the adoption of a position expressly rejected in *Hoohuli*. In *Gillen*, the United States Court of Appeals for the Eighth Circuit reviewed a decision of the United States District Court for the Eastern District of Arkansas, which had diversity jurisdiction and was faced with a question of first impression under Arkansas law. In *Gillen*, Carl Garrison was the owner of a 1961 Chevrolet automobile and the named insured on an automobile insurance policy issued by Globe Indemnity, which included coverage for the Chevrolet. It was clear that Garrison purchased the car primarily for the use of his seventeen-year-old daughter, Suzy, who lived at home and used the car primarily to drive to and from school. The Globe Indemnity policy included an omnibus clause that provided coverage for "any other person using such automobile with the permission of the named insured." Garrison had explicitly instructed Suzy not to allow anyone else to drive the car. Suzy, however, allowed her boyfriend, Larry Gillen, to drive the car on one occasion, and Gillen was involved in an accident.

Despite what appeared to be relevant Arkansas precedent to the contrary,[2] *see, e.g., Dodson v. Sisco*, 134 F.Supp. 313, 317 (W.D. Ark.1955) ("[t]he original permittee who has been given permission to use the automobile but had been expressly forbidden to delegate this authority cannot do so, and the use of the car by the second permittee in violation of the named insured's express order is not within the protection of the policy"); *Allstate Ins. Co. v. Mathis*, 232 Ark. 484, 339 S.W.2d 132 (1960) (approving a jury instruction that would deny omnibus coverage if the jury found that the named insured forbade the first permittee to allow the second permittee to drive the insured car), the *Gillen* court advocated[3] the application of the "liberal" or "initial permission" rule and cited to cases so holding, including *Matits v. Nationwide Mutual Insurance Co.*, 33 N.J. 488, 166 A.2d 345 (1960), the very case cited by the *Hoohuli* court as exemplifying the "initial permission" rule. *See Gillen*, 377 F.2d at 332; *see, e.g., Allstate Ins. Co. v. Fidelity & Casualty Co. of New York*, 73 N.J.Super. 407, 418, 180 A.2d 168, 174 (1962) ("'We think that the "initial permission" rule best effectuates the

---

2. The *Gillen* court noted:
   Though we have no assurance that the case before us would be approached by the Arkansas courts in a manner similar to our approach herein, certainly there is nothing to indicate that Arkansas courts would follow a rule other than the apparently unanimous position on this point announced by *Dodson v. Sisco*.
   377 F.2d at 333.

3. The *Gillen* court readily acknowledged that, because Arkansas law controlled the disposition of the case and, having characterized the issue before it as one of first impression in Arkansas, its disposition of the case would have no binding effect on Arkansas law, and therefore that its pronouncement of the law was purely conjectural:
   To apply coverage in the case before us we would have to take an additional step and say that relinquishing control of an insured vehicle to one that could reasonably be foreseen to loan the car to a third person, contrary to instructions, implies permission by the named insured to the third party use. We know of no court that has gone this far, and the Arkansas courts have given no indication that they would place themselves in a minority position by adopting such a rule.
   . . . .

Furthermore, we do not propose to establish the law of Arkansas on this matter. An attempt has been made under the necessity of our dual system of jurisprudence to anticipate what the law of Arkansas might be, but this is little more than a fiction. The questions of risks and insurance protection are questions perhaps as strongly influenced by a state's own notion of public welfare and social policy as by decisions of sister jurisdictions. We deplore the role of having to decide cases that may be precedent in the establishment of purely local law and policy. It would have been preferable for this action to have been brought in the state courts in order that a definitive state ruling might have been obtained. For when presented with this or a like question, the Arkansas courts may wish to take an entirely different approach, and rightfully so. . . . At any rate, the presently undeclared law of Arkansas on this issue might, and should be free to develop in an entirely different manner if and when the Arkansas courts are given the opportunity to rule on these questions.
377 F.2d at 333.

legislative policy of providing certain and maximum coverage, and is consistent with the language of the standard omnibus clause in automobile liability policies. Accordingly, we hold that if a person is given permission to use a motor vehicle in the first instance, any subsequent use short of theft or the like while it remains in his possession, *though not within the contemplation of the parties,* is a permissive use within the terms of a standard omnibus clause in an automobile liability insurance policy.' " (citing *Matits,* 33 N.J. at 496–97, 166 A.2d at 349 (emphasis added))); *Brooks v. Delta Fire & Cas. Co.,* 82 So.2d 55 (La.App.1955) ("The initial permission given by the named assured to an original permittee includes, according to the better view, the use of the automobile by a second permittee where in doing so the second permittee serves some purpose, benefit, or advantage of the first permittee." (citing *Longwell v. Massachusetts Bonding & Ins. Co.,* 63 So.2d 440, 443 (La.App.1953))).

However, as noted above, this court expressly rejected the "initial permission" rule in *Hoohuli:*

> We conclude that the benefits from extended coverage justifies an expansive interpretation of the omnibus clause. We believe, however, that the requirement of consent places a limit of reasonableness on this court. Therefore, *while we will construe the scope of permission more broadly than under the minor deviation rule, we will not go so far as to construe it so broadly as to adopt the initial permission rule.*

50 Haw. at 218, 437 P.2d at 105 (emphasis added).

The dissent further makes much of the fact that the *Hoohuli* court mentioned that, at the time the appeal before it was decided, the legislature had not yet enacted a mandatory insurance scheme. The *Hoohuli* court noted that "[a] more extreme rule [than the Vermont rule adopted in *Hoohuli* ] might be justified if the legislature were to enact a mandatory insurance law." 50 Haw. at 219

n. 4, 437 P.2d at 105 n. 4. The legislature has since enacted a mandatory insurance law, *see* HRS ch. 431:10C (1987 Spec. Pamphlet, Supp.1992 & Comp.1993 & 1994); but, it would be imprudent to interpret the passage of such a statutory scheme alone as authorizing the adoption of the "liberal" or "initial permission" rule. The primary objectives of the implementation of the mandatory insurance scheme were to:

> (1) institute insurance reform in order to (a) expedite the settling of all claims, (b) create a system of reparations for injuries and loss arising from motor vehicle accidents, (c) compensate these damages without regard to fault, and (d) modify tort liability for these accidents; and (2) *to reduce the cost of motor vehicle insurance by establishing a uniform system of motor vehicle insurance.*

*Methven–Abreu v. Hawaiian Ins. & Guar. Co.,* 73 Haw. 385, 393, 834 P.2d 279, 284 (1992) (emphasis added) (quoting *Hawaiian Ins. & Guar. Co. v. Financial Sec. Ins. Co.,* 72 Haw. 80, 91, 807 P.2d 1256, 1261, *reconsideration denied,* 72 Haw. 616, 841 P.2d 1074 (1991)), *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992). It is apparent from the above-quoted passage that the mandatory insurance scheme was implemented to provide for *both* wide compensation *and* cost reduction. Thus, the enactment of HRS ch. 431:10C benefits persons injured as a result of motor vehicle accidents, named insureds, and the automobile liability insurance industry. In our view, this does not demonstrate any legislative intent to expand the *Hoohuli* principles to encompass the "liberal" or "initial permission" rule.

As the principles announced in *Hoohuli* control the present case, it is unnecessary to look to case law from other jurisdictions cited by the parties and the dissent. We must note, however, that because decisions in this area are extremely fact-sensitive, the presence or absence of one additional factor may change the result.[4]

---

4. The dissent expresses much concern over the effect of the holding in the present case on a "variation of the facts of this case." *See* Dissenting opinion at 1052–1053. We acknowledge the panoply of factual situations that may arise in

permissive use law and recognize that different cases may merit different results. Nevertheless, we decline to compromise the just disposition of the present case in any way in favor of a general rule capable of purportedly wider prospective

## IV. CONCLUSION

For the reasons stated above, we vacate the circuit court's order granting summary judgment in favor of Vicente and remand this case with instructions to enter summary judgment in favor of AIG and against Vicente.

NAKAYAMA, Justice, dissenting.

I disagree both with the approach the majority takes in analyzing whether Bateman had the implied permission of Corpuz to operate the insured vehicle (the Mazda or the car) and its conclusion that because Corpuz "did not place 'complete dominion' over the insured vehicle in Aida[,]" Bateman "*could not* have driven the insured vehicle with the implied permission of Corpuz." Majority at 1046–1047 (emphasis in original). Accordingly, I respectfully dissent from the majority opinion.

### A.

I agree with the majority that by force of Hawai'i Revised Statutes (HRS) §§ 431:10C–301(a)(2) (Supp.1992) and 287–25(2) (1985), the omnibus clause of the AIG policy extends coverage to any person using the Mazda with the express or implied permission of the named insured, *i.e.*, Corpuz. *Id.* at 1043. I also agree that on the record before us Corpuz did not give Bateman express permission to use the car, and, therefore, the question narrows to whether "Bateman was operating the insured vehicle with Corpuz's implied permission." *Id.* at 1043. I disagree, however, that Corpuz's instruction to Aida not to

allow anyone else to drive the car is "outcome-dispositive" on the question of implied permission. *Id.* at 1044.

As I read the majority opinion, it establishes a rule of law that when a named insured prohibits persons other than the first permittee from operating the insured vehicle, implied permission cannot be found in favor of a second permittee—at least in the absence of facts showing that the named insured has implicitly revoked his/her prohibition by knowingly acquiescing in the second permittee's use. In my view, such a strict rule is inconsistent with the legislative purpose of our statutes requiring liability insurance contracts to extend coverage to persons using the insured vehicle with the express or implied permission of the named insured, *i.e.*, HRS §§ 431:10C–301(a)(2) and 287–25(2). Those statutes were designed primarily to avoid uncompensated losses to innocent parties injured by otherwise uninsured drivers. *See Columbia Casualty Co. v. Hoohuli*, 50 Haw. 212, 215 n. 2, 437 P.2d 99, 102 n. 2 (1968). To effectuate that fundamental purpose, the inquiry into whether a second permittee has implied permission to use the insured vehicle must take into account factors other than whether the named insured has restricted the use of the vehicle to the first permittee.

### B.

Like the majority, I believe that *Hoohuli, supra*, provides the proper analytical framework for deciding the issue before us. I disagree, however, with the manner in which the majority applies *Hoohuli* in this case.

---

application. Ironically, the dissent's criticisms ignore the closing admonitions of the *Gillen* opinion:

> With this ruling, however, we must add a word of caution. The decision in this area often appear to be delicately balanced on the peculiar facts of the individual cases. The change of a few facts might be enough to imply consent in the named insured.... *The addition or subtraction of any one of the many factors present could easily have changed the holding herein.*

377 F.2d at 328 (emphasis added). Similarly, the dissent's view that the "only real virtue" of the rule we announce today is the "certainty of its application," Dissenting opinion at 1047 n. 3,

highlights the dissent's preoccupation with factual situations that are not before us for disposition. As we noted in *Hoohuli*:

> None of the approaches previously described provides absolute certainty. The alleged high degree of certainty which accompanies the strict and initial permission rules turns out to be illusory because of the exceptions which seem to evolve. *Nor do we believe it proper to exalt predictability, even if absolutely attainable, over other considerations. In the absence of an absolute rule that the omnibus clause extends coverage to every person driving the insured automobile, doubt will exist.*

50 Haw. at 218, 437 P.2d at 105 (emphasis added).

The question in *Hoohuli* was whether the omnibus clause extended coverage to the operator of an insured vehicle (the second permittee) who used the vehicle in a manner prohibited by his employer (the first permittee). In answering that question in the affirmative, the *Hoohuli* court recognized that the construction of a statutorily imposed omnibus clause required a balancing of competing interests:

> By extending coverage, the omnibus clause protects the named insured, the permittee who may be uninsured otherwise, and the innocent party injured by an otherwise uninsured permittee. Clearly these interests would support the broadest possible construction.... On the other hand, the legislatively required omnibus clause infringes on the insurer's right to select its risks. The clause shifts to the named insured the right to select additional insureds which the insurer may have declined to cover. Moreover, in selecting the additional insured, the named insured may be unconcerned with the additional insured's "insurability." These reasons would support a relatively narrow construction.

*Id.* at 217–218, 437 P.2d at 104.

Mindful that "[t]he purpose of expanded coverage through statutory imposition of the omnibus clause is to avoid the loss to innocent parties injured at the hands of otherwise uninsured drivers," *id.* at 215, n. 2, 437 P.2d at 102 n. 2, the court held that the balance among the competing interests should be struck in favor of the innocent victims, the permittees and the named insured. It therefore "conclud[ed] that the benefits from extended coverage justif[y] an expansive interpretation of the omnibus clause." *Id.* at 218, 437 P.2d at 105. However, in consideration of the contrary interests of the insurer, the court also held that the expansive interpretation of an omnibus clause was subject to a "limit of reasonableness." *Id.* at 219, 437 P.2d at 105.

Applying the "expansive, yet reasonable" interpretation of the omnibus clause, the court adopted a test that would allow a finding of implied permission—*i.e.*, coverage under the omnibus clause—notwithstanding a second permittee's failure to abide by the use limitations imposed by the first permittee:

> [W]ith a showing that the vehicle was placed in the hands of the operator by consent, a presumption arises that the particular use to which the vehicle was being put was within the scope of that consent as measured by law. The overcoming of this presumption requires evidence establishing that consent had been expressly withdrawn prior to the actual use, or that the actual use was so far afield from the purpose of the loan of the vehicle as to amount to, at best, a temporary tortious conversion.

*Id.* at 219, 437 P.2d at 105 (quoting *American Fiduciary Co. v. North Brit. & Merc. Ins. Co.*, 124 Vt. 271, 275, 204 A.2d 110, 113 (1964)).

*Hoohuli*, then, holds that a second permittee's failure to strictly adhere to the use limitations imposed by the first permittee does not preclude a finding of implied permission under the omnibus clause. Instead, implied permission to use the insured vehicle will be found as long as the use violation amounts to something less than "a temporary tortious conversion[,]" or a "gross deviation" from the scope of permission given by the first permittee (or the named insured). *Id.*, 50 Haw. at 219–20, 437 P.2d at 105–06. Stated differently, under *Hoohuli*, the fact that the second permittee has ignored or was otherwise unaware of the first permittee's order not to use the insured vehicle in a certain manner is not "outcome-dispositive" on the question of implied permission.

The majority endorses *Hoohuli* as "controlling."[1] Majority at 1046. Having done

---

1. *Hoohuli*, of course, addressed a slightly different permissive use question than the one presented in the case at bar. As noted, in *Hoohuli*, the second permittee had permission to operate the insured vehicle, but used it in a manner prohibited by the first permittee. Here, the second permittee, Bateman, violated the named insured's, Corpuz's, instruction as to who was allowed to operate the vehicle. I agree with the majority that, notwithstanding these differences, the principles set forth in *Hoohuli* are controlling in this case. Nevertheless, because the specific question posed in this case is distinct from the one in *Hoohuli*, the "temporary tortious conversion" or the "gross deviation" test adopted in *Hoohuli* must be adapted to apply to the facts of this case.

so, however, the majority then follows with a complete *non sequitur*, reaching a result and creating a rule of law that are directly at odds with the principles set forth in *Hoohuli*. The majority states that

> it is undisputed that, when Corpuz granted Aida permission to drive the insured vehicle, he explicitly instructed her not to allow others to drive the vehicle. Corpuz, therefore, did not place "complete dominion" over the insured vehicle in Aida. The scope of Corpuz's permission to Aida, the first permittee, was *limited*, and inasmuch as a "second permittee is limited ... by the scope of permission from the named insured to the first permittee," [*Hoohuli*, 50 Haw.] at 220, 437 P.2d at 105, the scope of permission allegedly accorded Bateman, the purported second permittee, by Aida, the first permittee, was correspondingly limited; thus, Bateman *could not* have driven the insured vehicle with the implied permission of Corpuz. In other words, on the record before us, Bateman cannot possibly be a permissive user and cannot possibly be a "covered person" entitled to coverage under the AIG policy issued to Corpuz.

Majority at 1046–1047 (emphases in original).

As I read the majority's holding, it establishes a rule of law that once the named insured restricts the use of the insured vehicle to the first permittee—*i.e.*, gives the first permittee less than "complete dominion" over the vehicle—there can be no finding of implied permission in favor of a second permittee. In other words, under the majority's holding, *any* deviation from the named insured's express restriction as to who is permitted to use the insured vehicle precludes coverage under the omnibus clause. I cannot square that rule—which sounds to me like the "strict" rule expressly rejected by *Hoohuli*—with the principles set forth in *Hoohuli*. *Hoohuli* holds, as the majority acknowledges, that the statutory omnibus clause mandates coverage even in cases where the second permittee ignores the specific orders of the first permittee or the named insured, as long as the violation falls short of a "gross deviation" from those orders.

In adopting a rule that makes the restrictions imposed by the named insured or the first permittee outcome-dispositive, the majority construes the omnibus clause in a way that protects the interests of the insurer. Although *Hoohuli* recognizes the importance of the insurer's interests in construing the omnibus clause, it plainly holds that they are to be weighed against the interests of the permittee and the innocent injured party. 50 Haw. at 218, 437 P.2d at 104. Indeed, as noted above, *Hoohuli* holds that the interests of the permittee and the innocent party are to be given predominant weight. *Id. Hoohuli* further noted that the permittee and the innocent injured party might be entitled to even greater protection—*i.e.*, an even more expansive interpretation of the omnibus clause—were the legislature "to enact a mandatory insurance law." *Id.* at 219 n. 4, 437 P.2d at 105 n. 4. The legislature has since done so. *See* Act 347, 1987 Haw.Sess.Laws 148–179.

Despite its professed adherence to the "controlling" principles of *Hoohuli*, the majority fails even to mention, no less weigh heavily, the interests of the permittee and the innocent injured party in adopting its construction of the omnibus clause. As a result, under the majority's holding,

> a borrower of an insured automobile from its ostensible owner is denied financial protection solely on the basis of communications, unbeknown to him, between the actual owner and the first permittee. Furthermore, because of these private communications the motoring public is denied financial protection against losses caused by a driver who is otherwise legally and properly in possession of an insured automobile.

*Gillen v. Globe Indemnity Co.*, 377 F.2d 328, 333 (8th Cir.1967). Those consequences are directly contrary to the legislative purpose of the statutes requiring the inclusion of omnibus clauses in liability contracts.

In my view, the approach outlined in *Gillen, supra,* better harmonizes with the statu-

---

The specific test I would adopt, the *Gillen* approach, is discussed *infra.*

tory purpose of the omnibus clause and is more in line with the principles outlined in *Hoohuli*. *Gillen* states that, even in the face of express prohibitions against the loaning of the insured vehicle, implied permission from the named insured in favor a second permittee can be found

> [i]f the first permittee is actually in the car, or the car is being used for the benefit of the first permittee or of the named insured, or if the first permittee has an equivalent of equitable title and had unfettered control over the daily use of the car outside of the surveillance of the named insured, or if the named insured is aware of past violations of instructions but allows the permittee to retain possession, or when an emergency arises[.]

*Id.* at 332.

By taking into account factors other than the express prohibition by the named insured and focusing to a large extent on the apparent authority of the first permittee to delegate the named insured's permission to use the vehicle, the *Gillen* approach allows for coverage under the omnibus clause in a relatively wide variety of circumstances. At the same time, however, it places reasonable limits on when implied permission can be found, notwithstanding a named insured's prohibition against the loaning of the insured vehicle. In other words, it does not adopt "the broadest possible construction" of the omnibus clause, *Hoohuli*, 50 Haw. at 218, 437 P.2d at 104, and therefore takes into account, albeit to a lesser extent than the majority's approach would, the interests of the insurer.

Rather than directly joining the issue and addressing the merits of the *Gillen* approach, the majority attempts to dismiss *Gillen* on the ground that, in surveying the law existing at the time, the United States Court of Appeals for the Eighth Circuit cited to cases applying the so-called "initial permission" rule. The majority therefore contends that I

"ostensibly advocate[ ] the adoption of a position expressly rejected in *Hoohuli*." Majority at 1047.

The simple answer to that charge is that, under any fair reading, the *Gillen* approach, on its face, falls far short of the initial permission rule rejected in *Hoohuli*. As described in *Hoohuli*, the initial permission rule provides that, "if the permittee is given permission to use the car, regardless of express or implied restrictions on his operation, he is covered for any subsequent use short of theft or the like." 50 Haw. at 216, 437 P.2d at 105. Plainly, the *Gillen* approach does not mandate coverage under the omnibus clause "regardless of express or implied restrictions" as to who may operate the insured vehicle.[2] It simply requires a court, when construing the scope of the omnibus clause, not to give dispositive weight to the express or implied restrictions imposed by the named insured (or the first permittee), but to consider several other highly relevant factors. I believe that that approach is far more consistent with *Hoohuli*'s "expansive, yet reasonable" construction of the statutory omnibus clause than is the "complete dominion" or "strict" rule adopted by the majority.

I also believe that the majority ignores the implications of its holding, which, contrary to the suggestion at the end of the opinion, is quite broad in scope. Consider, for instance, the effect of the majority's "complete dominion" rule on a variation of the facts of this case. Assume all of the facts of this case, except that, rather than driving Aida home from work when the accident with Vicente occurred, assume that Bateman was driving her to the hospital because of a medical emergency. Under the majority's "complete dominion" test a court would be compelled to find, as a matter of law, that Bateman did not have Corpuz's implied permission to drive the Mazda, even if he did so to save Aida's life. It seems to me that such a harsh

---

2. If, as the majority contends, the *Gillen* approach is the equivalent of the initial permission rule that was rejected in *Hoohuli*, how does the majority explain *Gillen's* holding that there was no coverage under the omnibus clause? There are no facts in *Gillen* suggesting that Gillen's (the second permittee) operation of the insured vehicle, which was in direct violation of the named

insured's express restrictions, amounted to "theft or the like." Under the initial permission rule, those facts would require coverage. Under the *Gillen* approach they did not. That, I believe, conclusively demonstrates that the initial permission rule and the *Gillen* approach are not one and the same.

result is not only unwise on policy grounds, but is simply absurd.[3]

In my view, then, the *Gillen* approach strikes the balance among the competing interests counseled by *Hoohuli*—*i.e.*, it gives "an expansive interpretation" to the omnibus clause within the "limit[s] of reasonableness[.]" 50 Haw. at 218–19, 437 P.2d at 105. Accordingly, I believe that we should follow the *Gillen* approach in this jurisdiction.

### C.

Under the *Gillen* approach, the record before us contains evidence to support the granting of summary judgment in favor of Vicente. There is no dispute that: (i) Aida had Corpuz's permission to use the Mazda; (ii) Aida was in the car at the time of the accident; (iii) Aida gave permission to Bateman to operate the vehicle; and (iv) the car

was being used for Aida's benefit. Under *Gillen*, those undisputed facts establish implied permission, despite Corpuz's express instruction that no one but Aida was permitted to drive the car.

### D.

Because I believe that the trial court was correct in its assessment and ruling, I would affirm the award of summary in favor of Vicente, and therefore I respectfully dissent from the majority opinion.

---

**3.** Coverage under the omnibus clause could, of course, be found in such a situation if this court were to carve out some exception to the holding in this case. Even assuming that this court were inclined to recognize *ad hoc* exceptions to the "complete dominion" rule, in my view, that would undermine the only real virtue of the rule—*i.e.*, the certainty of its application. As the majority acknowledges, one of the reasons *Hoohuli* itself rejected the strict rule was that its "alleged high degree of certainty ... turns out to be illusory because of the exceptions which seem to evolve." *Hoohuli*, 50 Haw. at 218, 437 P.2d at 105.